UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL JAMES GLASER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:15 CV 863 ACL |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM AND ORDER**

Plaintiff Michael James Glaser brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. Glaser alleged that he was disabled because of schizoaffective disorder, depression, and hearing loss. (Tr. 199.)

An Administrative Law Judge (ALJ) found that, despite Glaser's multiple severe mental impairments, he was not disabled as he had the residual functional capacity ("RFC") to perform jobs that exist in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

### I. Procedural History

Glaser filed an application for SSI on June 15, 2012, claiming that he became unable to work due to his disabling condition on December 25, 2008. (Tr. 124.) Glaser's claim was

denied initially. (Tr. 42-57.) Following an administrative hearing, Glaser's claim was denied in a written opinion by an ALJ, dated February 26, 2012. (Tr. 9-20.) Glaser then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on April 27, 2015. (Tr. 4, 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

In the instant action, Glaser first claims that the "findings of residual functional capacity do not find support in some evidence as required under the standards contained in *Singh* and *Lauer*." (Doc. 15 at 6.) Glaser next argues that the "hypothetical question to the vocational expert does not capture the concrete consequences of Plaintiff's impairment, and therefore, the response of the vocational expert does not represent substantial evidence." *Id.* at 17.

## II. The ALJ's Determination

The ALJ found that Glaser has not engaged in substantial gainful activity since June 15, 2012, the application date. (Tr. 11.)

In addition, the ALJ concluded that Glaser had the following severe impairments: recurrent major depression and an anxiety disorder. *Id.* The ALJ found that Glaser did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. *Id.*

As to Glaser's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is able to understand, remember, and carry out at least simple instructions and non-detailed tasks and he can respond appropriately to supervisors and coworkers in a task oriented setting where contact with others is casual and infrequent. The claimant should not work in a setting

which includes constant/regular contact with the general public and
should not perform work which includes more than infrequent
handling of customer complaints. He has limited reading skills.

(Tr. 13.)

The ALJ found that Glaser's allegations regarding his limitations were not credible. (Tr. 14.) In determining Glaser's RFC, the ALJ indicated that he was assigning "considerable weight" to the opinion of consultative psychiatrist Georgia Jones, M.D. (Tr. 17.) He indicated that he was assigning less weight to the opinion of consultative psychiatrist Aqeeb Ahmad, M.D., as his opinion appeared to be based on Glaser's subjective complaints. *Id.*

The ALJ further found that Glaser has no past relevant work. (Tr. 18.) The ALJ noted that a vocational expert testified that Glaser could perform jobs existing in significant numbers in the national economy, such as warehouse worker and packer of agricultural goods. (Tr. 19.) The ALJ therefore concluded that Glaser has not been under a disability, as defined in the Social Security Act, since June 15, 2012, the date the application was filed. *Id.*

The ALJ's final decision reads as follows:

> Based on the application for supplemental security income filed on
> June 15, 2012, the claimant is not disabled under section
> 1614(a)(3)(A) of the Social Security Act.

(Tr. 20.)

### III. Applicable Law

### III.A. Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a

preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the

record as a whole. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted). *See also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

### III.B. Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any other kind of substantial gainful work which exists … in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's

physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of

the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id*. If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §416.920(a)(4)(v). At Step Five, even though the burden of

production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. *See id.* Next, the Commissioner must determine the severity of the impairment based on those ratings. *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. *See id.* If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare an RFC assessment. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV. Discussion

Glaser argues that the RFC assessed by the ALJ is not supported by "some" medical

evidence and therefore runs afoul of the standards contained in *Singh* and *Lauer*.

RFC is what a claimant can do despite his limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of his limitations. *Dunahoo v. Apfel,* 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. *See Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001); *Singh v. Apfel,* 222 F.3d 448, 451 (8th Cir. 2000). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. *See Lauer,* 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); *Casey v. Astrue,* 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. *See Cox v. Barnhart,* 471 F.3d 902, 907 (8th Cir. 2006).

Glaser first argues that the ALJ erred in evaluating the medical evidence and weighing the medical opinion evidence. "'It is the ALJ's function to resolve conflicts among the various treating and examining physicians.'" *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart,* 421 F.3d 745, 749–50 (8th Cir. 2005) (internal marks omitted)). The opinion of a treating physician will be given "controlling weight" only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Prosch v. Apfel,* 201 F.3d 1010, 1012–13 (8th Cir. 2000). The record, though, should be "evaluated as a whole." *Id.* at 1013 (quoting *Bentley v. Shalala,* 52 F.3d 784, 785–86 (8th Cir. 1997)). The ALJ is not required to rely on one doctor's opinion entirely or choose between the opinions. *Martise v. Astrue,* 641 F.3d

909, 927 (8th Cir. 2011). Additionally, when a physician's records provide no elaboration and are "conclusory checkbox" forms, the opinion can be of little evidentiary value. *See Anderson v. Astrue,* 696 F.3d 790, 794 (8th Cir. 2012). Regardless of the decision the ALJ must still provide "good reasons" for the weight assigned the treating physician's opinion. 20 C.F.R § 404.1527(d)(2).

The ALJ must weigh each opinion by considering the following factors: the examining and treatment relationship between the claimant and the medical source, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the physician provides support for his findings, whether other evidence in the record is consistent with the physician's findings, and the physician's area of specialty. 20 C.F.R. §§ 404.1527(c)(1)-(5), 416 .927(c)(1)-(5).

The ALJ conducted a thorough examination of the medical record, including the medical opinion evidence. The ALJ first discussed the report of Dr. Jones. (Tr. 14.) The ALJ noted that, due to Glaser's lack of treatment, he saw Dr. Jones for a psychiatric examination at the request of the state agency on February 26, 2011. (Tr. 14, 502-06.) Glaser complained of "borderline schizophrenia, antisocial." (Tr. 502.) Dr. Jones indicated that the accuracy of the history provided by Glaser was "questionable." *Id.* Glaser reported that he was not seeing a psychiatrist at present, and he last saw a psychiatrist before he was incarcerated in December of 2008 for failure to register as a sex offender. *Id.* Glaser had been incarcerated twice and was last released on November 30, 2010. *Id.* When asked to describe his borderline schizophrenia, Glaser stated that he thinks people are talking about him and ends up getting in fights. *Id.* Glaser stated that he has a hard time dealing with people and tries to stay away from people. *Id.* He reported that he was wrongfully convicted of statutory sodomy when he was approximately

sixteen years of age, and the victim was twelve to thirteen, and served five years for this offense. *Id.* Glaser reported that he saw a psychiatrist when he was younger and received SSI for diagnoses of attention deficit disorder, a behavioral disorder, and a learning disorder. *Id.* He also reported being physically abused at the age of six, being molested at the age of three, witnessing his step-father's suicide at the age of three, and being in state custody until he was nine. *Id.* Glaser reported occasional difficulty sleeping, poor appetite, poor focus and concentration, anhedonia, increased irritability, feeling sad, and feeling hopeless and helpless. (Tr. 503.) Dr. Jones indicated that Glaser would not give her specifics about his sleep schedule to determine if he suffered from insomnia, and noted that Glaser did not look as though he had lost or gained a great deal of weight, as his clothes fit appropriately. *Id.* Glaser was able to focus and concentrate during the examination, and appeared "consciously evasive about certain topics." *Id.* Glaser last worked in 2007 cleaning cars, a position from which he was terminated because he got into a fight. *Id.* Glaser admitted to the use of marijuana and methamphetamine in the past, and indicated he last used marijuana in 2008 and he last used methamphetamine in 2005. *Id.* Upon mental status examination, Glaser was appropriately groomed, had fair eye contact, was coherent and logical in his answers, his stream of speech and mental activity were normal, his mood was described as depressed and his affect appeared to be reactive, he denied thought disturbances and suicidal or homicidal ideation, he endorsed ideas of reference Dr. Jones attributed to an Axis II disorder, and he was oriented. (Tr. 504.) Dr. Jones found that Glaser's social functioning appeared to be intact, his ability to care for his personal needs was intact, and his concentration, persistence and pace were good throughout the examination. (Tr. 505.) Dr. Jones diagnosed Glaser with depressive disorder not otherwise specified; marijuana use, if not abuse, in long-term, full remission; amphetamine dependence in long-term, full remission; personality disorder not

otherwise specified with cluster B traits;[1] and a GAF score of 60-65.[2]  *Id.*  Dr. Jones stated that, although Glaser was capable of managing his own funds, if granted benefits, a payee should be appointed to ensure his benefits are spent in his own best interest due to his substance use.  *Id.*

The ALJ noted that Glaser underwent a second consultative examination at the request of the state agency, with Dr. Ahmad, on July 3, 2012.  (Tr. 525-27.)  Dr. Ahmad indicated Glaser was a "poor to marginal historian."  (Tr. 525.)  Glaser reported that he was fired from a job on September 6, 2011, where he had worked for three months, and he was currently suing Jack in the Box for discrimination.  *Id.*  Glaser indicated that his co-workers at Jack in the Box were making fun of him and calling him slow.  *Id.*  He went on to report that he could not work because he does not like people and wants to be left alone.  *Id.*  Glaser stated that he will hurt people if they cross him, and that he was "antisocial."  *Id.*  He reported that he gets angry easily, gets upset, and feels people talk about him and make fun of him.  (Tr. 526.)  Glaser reported that he could work alone if possible but, for example, was unable to get a security job because he is a convicted felon. *Id.*  Glaser complained of decreased sleep, anger, some depression, and occasional sadness.  *Id.* He reported a fairly good memory and fairly good energy level.  *Id.*  Glaser reportedly made a suicide attempt when he cut his left forearm about three years prior.  *Id.*  Glaser denied auditory hallucinations, but he felt people were against him and were always talking about him.  *Id.*  He

---

[1] Cluster B personality disorders include Antisocial, Borderline, Narcissistic, and Histrionic Personality Disorders.  *See American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders* 659-72 (5th ed. 2013) ("*DSM V*").

[2] A GAF score of 51 to 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *See American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders* 34 (Text Revision 4th ed. 2000) ("*DSM IV-TR*").  A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

was currently receiving no treatment and his last treatment was in November 2008. *Id.* Glaser indicated that he had been hospitalized on multiple occasions for anger and acting out, but he did not provide the name of the hospitals. *Id.* Glaser stated that he uses marijuana whenever he can afford it because it calms his nerves, and he drinks approximately once a month. *Id.* Upon mental status examination, Glaser's grooming and hygiene were fair, his speech was fluent and coherent although there was some poverty of content, his psychomotor activity appeared decreased, his mood fluctuated and appeared mildly anxious during the interview, he was fully alert and oriented, he was able to do serial three subtractions fairly quickly and correctly, his judgment appeared poor, and he showed some partial insight into his problems. (Tr. 528.) Glaser was unable to tell Dr. Ahmad exactly how he passes his time except to say that he is figuring out how to get disability. *Id.* Dr. Ahmad diagnosed Glaser with not otherwise specified psychotic disorder, impulse control disorder, antisocial personality disorder, and a GAF score of about 40.[3] *Id.* He stated that Glaser "appeared dysfunctional, not receiving any treatment for his medical or psychiatric problems." (Tr. 527.) Dr. Ahmad stated that Glaser "seems to not get along with people and possibly not function at a competitive level and possibly does not follow directions well." *Id.* He further found that Glaser will not be able to manage his funds due to his tendency to abuse substances. *Id.*

The ALJ stated that Glaser presented to SSM DePaul Health Center with complaints of pain and fullness in his left ear on December 27, 2012. (Tr. 559.) Glaser reported that he drank twenty-four drinks a week at that time. (Tr. 558.) Wax was cleared from Glaser's ear. *Id.*

---

[3]A GAF score of 31–40 indicates some impairment in reality testing or communication (*e.g.,* speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.,* depressed man avoids friends, neglects family, and is unable to work). *See DSM IV-TR* at 34.

Glaser presented to Grace Hill Health Services, Inc., on January 28, 2013, with complaints of anger, anxiety, and depression. (Tr. 584.) Glaser reported that he was not on any psychiatric medications. *Id.* He also indicated that he wanted to get treatment for hearing problems and wanted to get hearing aids. *Id.* Glaser was diagnosed with anxiety disorder not otherwise specified, and was encouraged to make an appointment with a primary care provider. *Id.*

A treatment plan was prepared for Glaser by Intake Specialist Jane Calloway[4] at BJC Behavioral Health Community Mental Health Center ("BJC") in May of 2013. (Tr. 610-18.) Glaser reported that he needed medication and had been trying to find mental health services, including a doctor and a case worker. (Tr. 610.) He indicated that he had been having suicidal thoughts without a plan. *Id.* Glaser reported multiple psychiatric admissions over the years, beginning at the age of nine or ten. *Id.* Glaser stated that his last suicide attempt was in 2008, after which he was in a nursing home from July 1, 2008, to November 2008. *Id.* He described physical and sexual abuse as a child. *Id.* Glaser reported that he smokes marijuana at night to help him sleep. *Id.* He also reported using alcohol. (Tr. 612.) Glaser was living with his girlfriend in his parents' home. (Tr. 610.) Ms. Calloway concluded that Glaser needs ongoing mental health treatment and referred him for services. (Tr. 613.)

The ALJ noted that Glaser did not begin seeing a psychiatrist until July 23, 2013, when he presented to Narayanarad Kosuri, M.D., at BJC. (Tr. 15, 593-96.) On that date, Glaser reported that his moods were "very bad." (Tr. 593.) Glaser indicated that Depakote[5] made him agitated so he stopped taking it, and that he took Abilify,[6] which helped but made him tired. *Id.* He

---

[4]Ms. Calloway's credentials were not provided in these records. She is simply referred to as "Intake Specialist." (Tr. 617.)
[5]Depakote is indicated for the treatment of the manic phase of bipolar disorder. *See* WebMD, http://www.webmd.com/drugs (last visited August 25, 2016).
[6]Abilify is an anti-psychotic drug indicated for the treatment of bipolar disorder, schizophrenia,

stated that he got upset with his girlfriend the previous week, became agitated, and scratched himself with a knife. *Id.* Upon mental status examination, Glaser was well-groomed, cooperative, had a full affect, he reported his mood was "ok now" but he experiences racing thoughts, he exhibited sustained attention and concentration, he denied suicidal ideations, his perceptions were normal, his tone was appropriate, his psychomotor activity was normal and restless, he was alert, his fund of knowledge was average, his memory was normal, and his insight and judgment were fair. (Tr. 593-96.) Dr. Kosuri's assessment was mood disorder, getting better. (Tr. 596.) Dr. Kosuri discontinued the Depakote, and started Glaser on Lamictal.[7] *Id.*

On September 12, 2013, Glaser complained that he had been out of medication for a few days, and his mood was agitated, irritable, anxious, and depressed. (Tr. 597.) Dr. Kosuri indicated that Glaser needed a medication adjustment. (Tr. 600.) She discontinued Glaser's medications and started him on Geodon.[8] *Id.* On October 3, 2013, Glaser reported he was better. (Tr. 601.) His anger, agitation, impulse and moods were better, and no incidents occurred. *Id.* Glaser stated that he was "bored" and wanted to work, but he applied for SSI so he could not work until his case was determined. *Id.* Glaser also reported that he could not keep a job because he was slow or had a mood problem. *Id.* He indicated that he would start some kind of a hobby. *Id.* Dr. Kosuri noted no abnormalities on mental status examination. (Tr. 601-04.) Dr. Kosuri's assessment was stable mood disorder. (Tr. 604.) She continued Glaser's medications. *Id.* On December 2, 2013, Glaser reported he was "doing good" and had no complaints. (Tr. 605.) He was still "bored." *Id.* Dr. Kosuri noted no abnormalities on examination and assessed

---

and depression. *See* WebMD, http://www.webmd.com/drugs (last visited August 25, 2016).
[7]Lamictal is indicated for the treatment of bipolar disorder. *See* WebMD, http://www.webmd.com/drugs (last visited August 25, 2016).
[8]Geodon is an anti-psychotic drug indicated for the treatment of bipolar disorder and schizophrenia. *See* WebMD, http://www.webmd.com/drugs (last visited August 25, 2016).

Glaser with stable mood disorder, stable anxiety, and impulse control getting better. (Tr. 605-08.) She continued Glaser's medications and indicated he would follow up at the Crider Center. (Tr. 608.)

The ALJ found that Glaser experienced significant improvement and even stabilized after only a few months of treatments. (Tr. 17.) The ALJ further stated that Glaser's lack of treatment prior to July 2013, his stabilization and improvement after treatment started, and the inconsistencies throughout the record support the RFC formulated by the ALJ. *Id.* The evidence discussed above supports the ALJ's finding.

In determining Glaser's RFC, the ALJ also performed a credibility analysis and found Glaser's allegations were not credible. Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. *Wagner v. Astrue,* 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart,* 403 F.3d 953, 957 (8th Cir. 2005). Credibility questions are "primarily for the ALJ to decide, not the courts." *Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003).

Glaser testified at the hearing that he was unable to work because "nobody will hire me" and because he was trying to get his mood stabilized. (Tr. 31.) The ALJ first noted that, despite his allegations of a disabling mental impairment, Glaser did not seek mental health treatment for years after his release from incarceration, when his hearing was approaching. (Tr. 14.) *See Partee v. Astrue*, 638 F.3d 860, 864 (8th Cir. 2011) (recognizing that failure to seek medical treatment for mental illness is a permissible factor in determining that claimant did not suffer from a disabling mental impairment); *Moore v. Astrue*, 572 F.3d 520, 524-25 (8th Cir. 2009) (appropriate for ALJ to consider conservative or minimal treatment in assessing credibility). The ALJ also accurately noted that the fact that an employer will not hire an individual who is on a sexual offender registry is not a reason to find one disabled. (Tr. 14.)

The ALJ next noted inconsistencies in the record.  *See Ply v. Massanari,* 251 F.3d 777, 779 (8th Cir. 2001) (noting a claimant's inconsistent statements as a factor to consider in determining claimant's credibility).   For example, Glaser reported to Dr. Ahmad and to the SSA that he was suing Jack in the Box for discrimination (Tr. 525, 277), yet he denied any such litigation at the hearing (Tr. 15, 30.)   Glaser reported difficulty interacting with others, but he was able to maintain a long-term relationship with his girlfriend.   (Tr. 32, 33, 37.)   The ALJ noted that Glaser provided inconsistent statements regarding his drug and alcohol use and his criminal history.   (Tr. 15, 18, 31, 503, 526, 601, 610.)   In addition, the ALJ pointed out that medical professionals found Glaser to be a poor historian, and that he provided evasive answers.   (Tr. 14-16, 18, 502-03, 525, 619.)

The ALJ also found that Glaser has a "horrible work record," with only one year of earnings exceeding the level of substantial gainful activity in the last fifteen years.   (Tr. 18.)   A poor work history lessens a claimant's credibility.  *See Fredrickson v. Barnhart,* 359 F.3d 972, 976–77 (8th Cir. 2004) (holding that claimant was properly discredited due, in part, to her sporadic work record reflecting low earnings and multiple years with no reported earnings, pointing to potential lack of motivation to work).

As to the opinion evidence, the ALJ indicated that he was assigning "considerable weight" to the report of Dr. Jones.   The ALJ noted that Dr. Jones found that Glaser was consciously evasive with her during the examination, and that this finding was consistent with Glaser's inconsistent statements discussed above detracting from his credibility.   Dr. Jones' opinion that Glaser's social functioning appeared to be intact, his ability to care for his personal needs was intact, and his concentration, persistence and pace were good are consistent with Dr. Jones' findings on examination.   (Tr. 505.)

The ALJ assigned "less weight" to the opinion of Dr. Ahmad, noting that Dr. Ahmad appeared to take Glaser's complaints at face value despite Dr. Jones' report. (Tr. 17.) Glaser contends that the ALJ erred in assigning more weight to Dr. Jones' opinion. The ALJ provided a sufficient basis for assigning more weight to Dr. Jones' opinion. Dr. Ahmad had Dr. Jones' report, in which Dr. Jones found that Glaser was consciously evasive in answering questions and was a questionable historian. Dr. Ahmad similarly found Glaser to be a poor historian. (Tr. 525.) Dr. Ahmad also acknowledged that Glaser was receiving no mental health treatment. (Tr. 526.) Dr. Ahmad then found that Glaser "*appeared* dysfunctional," and "*seems* to not get along with people and *possibly* not function at a competitive level and *possibly* does not follow directions well." (Tr. 527, emphasis added.) Dr. Ahmad's statements support the ALJ's conclusion that Dr. Ahmad's findings were based, at least in part, on Glaser's subjective reports. Because the ALJ found Glaser's subjective allegations were not credible, the ALJ provided a sufficient basis to assign less weight to Dr. Ahmad's opinion.

Glaser next argues that the ALJ's RFC determination is not supported by the opinion of non-examining state agency consultant Terry Dunn, Ph.D. Dr. Dunn completed a Mental Residual Functional Capacity Assessment on March 17, 2011. (Tr. 519-21.) Dr. Dunn found in his "Summary Conclusions" section that Glaser was moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, and interact appropriately with the general public. (Tr. 519-20.) Glaser contends that these limitations are inconsistent with the ALJ's RFC determination. Dr. Dunn, however, found in his "Functional Capacity Assessment" that Glaser

was "capable of performing work that does not involve skilled job tasks that does not involve working closely with the general public." (Tr. 521.) That finding is consistent with the ALJ's determination that Glaser could understand and carry out only simple instructions and non-detailed tasks, and that he was limited to only casual and infrequent contact with others and should not work in a setting that includes regular contact with the general public, or work that includes more than infrequent handling of customer complaints. (Tr. 13.)

The ALJ's mental RFC determination is supported by substantial evidence in the record as a whole. The ALJ found that Glaser's subjective complaints were not credible. Significantly, Glaser did not receive any mental health treatment for years after his release from incarceration. The ALJ's determination is consistent with the finding of consultative psychiatrist, Dr. Jones, and state agency consultant, Dr. Dunn. It is also supported by the records of treating psychiatrist Dr. Kosuri, which reveal that Glaser's mood disorder stabilized after only a couple of months of treatment and medication management. Glaser's only complaint at his last visit with Dr. Kosuri was that he was bored. None of Glaser's treating mental health providers found greater limitations than those set forth by the ALJ.

Glaser also contends that the ALJ did not consider his hearing impairment, which required hearing aids. The ALJ found that Glaser's hearing loss has not been demonstrated to cause any limitation of his ability to perform work-related activities and was not, therefore, severe. (Tr. 11.) This finding is supported by the record. The medical record reveals that Glaser was seen by health care providers on several occasions with complaints of ear pain, impacted earwax, and difficulty hearing. (Tr. 16, 559, 571-78.) In January 2013, Glaser indicated that he wanted hearing aids. (Tr. 584.) On June 20, 2013, Glaser reported that his ear symptoms began in early childhood. (Tr. 571.) Although there was no evidence of active disease, a CT scan was ordered

and the possibility of hearing aids was discussed. (Tr. 572.) There is no record of hearing aids ever being prescribed. At the administrative hearing, Glaser testified that he had had ear surgeries in the past, and that he has problems with wax building up. (Tr. 32.) The ALJ's finding that Glaser's hearing impairment does not result in any work-related limitations is supported by substantial evidence.

After determining Glaser's RFC, the ALJ properly relied on the testimony of a vocational expert to find that Glaser could perform other work existing in significant numbers in the national economy with his RFC. (Tr. 19.) *See Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a vocational expert's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations). The hypothetical question posed to the vocational expert was based on the RFC formulated by the ALJ, which accounted for all of Glaser's credible limitations. Thus, the ALJ's decision finding Glaser not disabled is supported by substantial evidence.

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

/s/ Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of September, 2016.